Good morning. Good morning, Your Honors, and may it please the Court. Raquel Busani for the Plaintiff Daily. The primary issue, as the briefs articulated, was whether the ALJ supported his decision with substantial evidence. As the Daily consents, he did not. However, I'd like to focus argument, unless Your Honors would prefer to ask other questions, but I'd like to focus on three issues that were presented in the briefings. One, in particular, whether Daily is requesting a higher articulation standard for then clear and convincing for the rejection of subjective symptoms testimony. She is not. The second one, whether the Commissioner conceded that the ALJ mischaracterized and cherry-picked evidence by not meaningfully rebutted it in the briefs, including the District Court briefs. We contend that he did. And the last, whether the germane reason standard for rejecting the third-party evidence still applies in light of the 2017 regulations, and we contend that it does. And I'd like to highlight that the reason why Daily contends that these articulation standards apply is because the purpose of these standards, as has been discussed by the Ninth Circuit, is to provide the reviewing courts with adequate information as to the reasons behind the ALJ's decision. And I'd like to add that these articulation standards also provide the claimants with enough information. When you have a decision by an ALJ that doesn't clearly articulate the reasons why certain evidence is rejected, you have more cases that end up in court. And maybe they end up in court without adequate reasons, but unless the plaintiff isn't aware of what evidence was rejected and why, they're going to want to seek review. On the first point as to whether Daily is requesting a higher standard than clear and convincing, the appellees contend that she is, on the one hand, asking the ALJ to weigh In fact, the ALJ is required to consider evidence of fibromyalgia, which is Daily's primary, or rather, it's her overarching condition. The ALJ is required to weigh that evidence and the symptoms of fibromyalgia in the totality of the record. So the fact that Daily also has degenerative disc disease or arthritis in her hands should be considered in light of fibromyalgia, which, as the courts have recognized, including in the case of Rebels, fibromyalgia exacerbates other pain and other symptoms. So what Daily is asking is not that the ALJ articulate any higher standard than the clear and convincing, but rather that the ALJ articulate clear and convincing reasons. We argue that he did not in this case. For example, we argue that he consistently mischaracterized and cherry-picked the evidence. I cite in the briefing various examples where What does it mean to cherry-pick the evidence? I mean, there's, what, 10,000 pages of record here? I mean, you can't ask him to go through every page of evidence, right? Right. And I completely agree. I mean, even for, on our part, it's very difficult to go through all the records. Exactly. So what do you mean by cherry-picking the evidence, then? When you're looking at one record, you should look at the entire record. Okay, but it's 10,000 pages. No, no, I don't mean the entire record. I'm talking about, like, the visit notes. So we have various doctor's visits, you know, let's say, for example, and I cite some examples in the briefing. If you have a doctor's visit dated, I don't know, October of 2020, you should look at that entire visit. You shouldn't just pick one page that might say, for example, the patient is not in distress, when the rest of the record explains that she's actually complaining of various pain symptoms, that she has depression, that, you know, I'm giving you just... Yeah, but then that's not relevant. Like, if he's analyzing the pain, for example, right, it's not relevant whether or not she's feeling depressed about that, right? So why would he have to go through that evidence when he's talking about pain? He's talking just about pain. I'm just giving you an example. Right, and that's my point, though. Like, you can't say he cherry-picked it, but he talked about the relevant facts. But he didn't, in fact. So there's, and again, I cite in my brief various examples where he cited to no distress. First of all, the term no distress is a term of art in medicine. It doesn't mean that the person is not experiencing symptoms. It simply means that the person is not experiencing symptoms that, for example, require emergency treatment. Do you agree that there were, at least, there's evidence in the record where she showed up to a doctor and she said she had no pain? I think there was, I don't think there was any evidence in the record that says that she had no pain. There's evidence in the record where she apparently said she felt well. There were subjective... But there were times where the pain from, you know, we all agree that fibromyalgia lacks and wanes, right? Right, right, and yes. So there's evidence in the record where it wanes, right? Right, right. I mean, there's no, we do not contest that her fibromyalgia waxes and wanes. There are days, she says herself that there's days when she feels better and there's days  But then she also said, this is my problem, is she said, my pain is 24-7. My pain never leaves. Right. That's contradicted by the record. There's, I don't believe it's contradicted by the record. There's never... But we disagree that there was times when her pain waned, right? But that doesn't mean that no pain exists. Pain is subjective. So just because it's not as bad one day doesn't mean it's not present. Well, I guess my point would be, wouldn't that be basis enough for the ALJ to reject that testimony, though? Not in light of the fact that the records that he cites to that supposedly say that the pain is... He never says that there's no pain. He says that the patient was not in distress. Those records show complaints of pain or show complaints of fatigue. If he's talking about pain, but he never says, he doesn't say there's evidence of no pain in records. He implies, based off of her statements or her doctor's writing, that she felt well. But well, again, is just a subjective statement. Somebody feeling well one day, for example, a person that maybe has cancer, they might feel well one day, but they're still experiencing symptoms. So we're dealing with a condition that is well known to be subjective in nature, as far as... I'm sorry, that has subjective symptoms in nature, and that it cannot always be supported by objective evidence. I guess my problem is there's reason to doubt the statement, though, that my pain is 24-7, my pain never leaves, it's on all the time. I disagree respectfully. Okay. I don't think that the ALJ cited sufficient evidence in the record that actually shows that she said, I don't have pain today. The fact that she said that she might have felt well, it does not mean that she did not experience pain. There's also, I mean, one of the other things that at least the Pelley's... She also said she has zero functionality, right? Normal functionality. Again, you have to pay attention to the word. Zero functionality versus zero normal functionality is, again, pointing at the subjective nature of activities. For her, normal was, and she explains this in prior functional reports, you know, before she became ill, she used to go out with friends, she used to go to concerts, she was a very active person, despite of obesity and some other symptoms that existed, she was very active. I'm sorry, what's the distinction you're making? Zero functionality versus zero what? Normal functionality. So a person that's expressing zero functionality, it would be reasonable to interpret as a person who's laying down 24-7 and can't do anything ever. A person who's experiencing zero normal functionality, it really depends on what normal is for that person. So it's subjective in nature. What normal for me, you know, my normal day is going to be very different than your normal day, which is very different than the normal day of a person who is perhaps a professional sports player. So normal functionality, it's subjective in nature. So those statements are not themselves proof that she was contradicting her statements. I mean, it's not proof, but it's evidence that supports ALJ's findings. I agree. I disagree. I'm sorry. Gotcha. Freudian stuff, no. No, I respectfully disagree on that point. I don't think it's sufficient evidence. Again, when you look at the rest of the record where he took, and again, the rest of the record is so, it's 10,000 pages. And I refer to various instances in the brief as where he mischaracterized this evidence. I noted neither, the appellees did not address any of these points in their briefings. That's one of the reasons why I'm saying that they conceded these points. If the ALJ would have at least considered, for example, her subjective He says that she runs a mile. She explains in her testimony that she's never run on land. Not that she doesn't run on land anymore, but that she never ran on land. She used to water jog. She uses a treadmill to walk. This is exercise that her doctors have suggested she engage in. But this is, I mean, we're talking about a person who became disabled in her late 40s. She is doing exercises that are Well, what do you think about the ALJ's point that that's evidence, again, that she's not disabled if the doctors are recommending that she exercise? Because if you're truly disabled, then they're going to not say to do that. No, there is no requirement in the case law that says that a person has to be completely bedridden to be disabled. Her doctors are telling her, you should exercise as much as you can, as much as you can tolerate, because it's helpful. And she has agreed that when she does exercises, it helps her, but it also fatigues her, and so she can't do anything else the rest of the day. In her testimony, she explained that she does one activity per day. She bathes one time once every five days, essentially. If she's going to go do her water exercises, she's going to not do anything else that day. If she's going to go run errands and have lunch with her friend, which she does, which she tries to do once a week, if not once a month, then she's not going to do anything else, and that's including bathing. The fact that she said, and the police take a big issue with this, she says that she reclines seven hours a day between eight to five. There's nine hours between eight to five. That's perfectly consistent with her testimony that she can only do one activity per day. Two hours if she's active. I think what you're saying makes perfect sense. My problem is that what the ALJ also said makes perfect sense, and how, you know, as judges, we're supposed to give deference to the ALJ, so I just don't know why we have to, we're compelled to take your inference versus the ALJ's inference. The ALJ has to provide specific, clear, and convincing reasons. The only way that his reasons are clear and convincing is if the court ignores her testimony. He didn't even consider in his determination her subjective testimony explaining, for example, that she doesn't run. For example, that she's only capable of activity for seven hours a day. He doesn't address any of those issues. He also doesn't address her supporting testimony from her parents. He ignores one letter completely. He does cite to the third-party forms, but he doesn't provide your main reasons. It's one of the reasons that we're, I think I'd like to reserve some time for rebuttal. And I'll give you some time. I do have a kind of a curveball question for you. This case has been around for a long time. Yes, it has. I'm curious what efforts there have been to mediate this case. So the first case, almost immediately we filed our, and I'm saying the first case, before the district court that was eventually remanded. We received an email from counsel right away saying, you know, we'd like to resolve this, do a remand. We didn't have that experience. After the initial district, with the second district court filing, we did receive any contact from counsel. And then once their decision was affirmed, we haven't had any contact. There haven't been any meaningful mediation. So there hasn't been really any mediation in this case at all? No, no. Would you be open to that in this case? I think our client would definitely be open to that. You know, this is not necessarily in the record, but her primary concern is that she cannot pay for health care. And it's all about money. I mean, this is an all about money case that's been up and down and up and down. Okay. So you would be open to mediation if the court were to order it? If the court were to order it, and that would work. And again, it would, and I would, I disagree that it's all about money. Again, Ms. Daley, again, this is not necessarily in the record, but as she has communicated to me, her primary concern is getting health care. She has had, and you can see this reflected in the records, she's had to change doctors. And so her primary concern is Medicare coverage at some point. Which is money. So, okay. I just want to make sure I understand that because, all right, fair enough. We'll give you some time for rebuttal. Okay. Thank you. Thank you. Good morning, Your Honors. Elizabeth Fair for Frank Bisognano, the Commissioner of Social Services. And we have no opinion of disability in this record, which is a very significant factor in the ALJ's analysis here, particularly when this claimant is alleging very extreme limitations, such as zero functionality. And on page 1650, Your Honor, it does say zero functionality. It doesn't say normal. There's another page 6910 that does include normal. But the first one, 1650, just says zero percent functionality. So she's alleged that. She's alleged she can't lift more than two pounds. She's alleged reclines up to eight hours a day. She can only sit upright for ten minutes at a time. She can't remember anything. And she can't do anything for more than three hours or she'll pass out. Given those extreme limitations and this massive record, you would expect at some point a doctor would issue an opinion that she has limitations that would be consistent with an inability to work. And that's not here. Instead, we have two state agency physicians who reviewed the record in 2018, in February and July, I believe. They found she could perform a range of light work. And then because she had applied again subsequent to the district court first There's another state agency physician who finds in 2022 that she's still capable of light work. Then there's two state agency physicians who look at her mental functioning and find one finds she doesn't have a severe impairment and the other finds that she can engage in simple activities the same way as the ALJ found in the RFC. The RFC is very detailed. From pages 2090 in the record through 2094, the ALJ goes through all the limitations in the RFC and how they're connected to her severe impairments. He also finds that her subjective allegations are not fully persuasive for various reasons. Her treatment history is stable throughout this. And a lot of times you have fibromyalgia cases. There's a lot of fluctuation in the treatment. Here it's relatively stable. You have inconsistencies. And I think Your Honor's pointed out, especially Judge Bumate, of the many inconsistencies in this record where, you know, she's saying she can't function and yet she is exercising. Her physicians not only didn't find any disability, they recommended exercise. If she was as limited medically as she's claiming, they wouldn't do that. They also, claimant's activities the ALJ relied on as inconsistent with her subjective allegations and also the objective findings. For instance, as late as June 2022, and this is on page 6910 again, she has no atrophy or muscle wasting. This court has found in the past that that lack of atrophy and muscle wasting is a significant reason for an ALJ to find non-disability when a claimant is alleging the kind of extreme pain that she is here. So, in terms of everything I just said, the ALJ's decision here is supported by substantial evidence. And I am happy to answer any other questions. Yeah, the one question I have is, how often does it happen that an ALJ will find disability if no doctor has opined on disability? You know, we don't usually see the cases where the ALJs find disability. So, I can't, I really can't speak to that. There's no, it's not precluded though, right? Correct. Yes. But when you talk about no opinion, I mean, do you mean there's there's no expert opinion presented in the context of this ALJ adjudication? I mean that this record doesn't contain, even though there's many treating sources, there's no. Why else, why else would it contain such an opinion? I mean, I haven't, God knows I've seen enough of these cases and it is true that in my observation, a claimant will ordinarily present opinion testimony favoring the claim, favoring a conclusion that the claimant was disabled. But I don't really see that in the background record. It's not like ordinarily physicians are opining on whether somebody is disabled, particularly under the social security standards. So, basically what I I'm hearing from you is that the presentation made by claimant here before the ALJ was missing this piece that ordinarily is found in most cases, but I'm not sure what else to draw from that. Well, Your Honor, I wouldn't say a piece is missing. An ALJ can find disability without that kind of evidence. But I would point to, there's three instances in this record where claimant asked a doctor for disability paperwork and the doctors expressly said no. So, that's on page 1611 and that's in July 2019. On page 1653, that was in May 2019. And on page 6385, which was in February 2020. So, I think that... I won't be surprised that those references don't actually jump up and mean something to me. In what context was the request made for the disability paperwork based on fibromyalgia and obstructive sleep apnea? So, what's the disability under what standard? Social security. It's in the context of our application process. So, the fact that these doctors said no is indicative of the ALJ... Are they her doctors or their... Yes, they're her doctors. And her doctors said no.  So, what was the page reference for the one you just talked about? 1611.  And then if you need the other ones, I have those as well. No, I just wanted to get an idea of what I was looking at. Okay. So, this ALJ's decision is very detailed. You can tell he's familiar with the record. He's familiar with the treatment history. He might not have cited everything that he could have to support all of his findings. We have, in our brief on page 39, notes 6 through 10, have a lot of extra citations that support the findings, particularly when she's not complaining of myalgias to the doctors. Even when she's complaining of these extreme limitations, the doctors still find no acute distress. This court has several unpublished cases. One very recently, last month, has found that ALJ can rely on the findings of no acute distress, particularly when the claimant's alleging such extreme limitations as she is here. So, if I may, the lay witness... I'm looking at 1611. It made reference to notes, did not feel comfortable filling out disability paperwork for sleep apnea. Discussed this was patient. Is that what you're referring to? Yes. And I believe it also has fibromyalgia on that same page. Well, it does, but doesn't say anything about... She said, discussed with patient referral to occupational therapy to evaluate how functional she is for filling out disability form, but doesn't say that the doctor wasn't prepared to make such a referral or opinion. So, I'm not sure how compelling that is as evidence. I mean, there does not appear to be a dispute. She was, in fact, diagnosed with fibromyalgia applying the... I've now forgotten the number of points, eight point or something under the social security rule. So, the question is how disabling the pain is during the waxing periods. And I'm not sure I understand why it is the ALJ can fairly rely upon things such as what she drives sometimes to demonstrate that, in fact, she doesn't have disabling pain at other times. Well, Your Honor, I don't think this record supports a contention that her symptoms wax and wane. For instance, she claims, as was brought up on my opponent's initial presentation, that she has repeatedly said that she has no good days. Page 140, she testified that to that. Page 742... So, do you translate to me that being no bad days? I think that she's testified her pain is always relatively the same. So, I don't think this record supports a classic waxing and waning situation for fibromyalgia. And I think the ALJ has explained how the stability of her treatment supports that. She's alleging the extreme situation where she is 24-7 in such pain that she can't function, that she needs to recline for eight hours a day, that she can't lift more than two pounds. That's inconsistent with what this record shows. And the fact that doctors were not willing to fill out disability paperwork in light of that kind of extreme allegation is persuasive evidence that the ALJ could rely on. It's a broader statement than the page we looked at supports. The doctor said he'd participate... I don't feel comfortable filling out disability paperwork. So, where is that evidence that the doctor said no to filling out disability forms for fibromyalgia? Well, that is her main allegation of disability. So, that one particular says... We just read 1611 and it didn't quite say that. So, I'm looking for what page does quite say that. Okay, it's 1653. She's here today for an initial evaluation of her pain complaints. That is related to fibromyalgia. And then that doctor says, I politely informed her that our practice does not fill out disability paperwork. She would like to continue with the workup today. That's page 1653. Well, wait, you just said the practice doesn't fill it out. It doesn't sound to me like a refusal because you're not disabled. Okay, and then page 6385. She's requesting our office to fill out disability paperwork. I asked her to bring a copy of paperwork for her next visit. Alternatively, she may email this to me, inform the patient. I will review her paperwork and determine if I am able to fill out such documentation. At this point, it wasn't viable. So, I can understand your point, Your Honor. No, no, no. It doesn't say it wasn't viable. He asked her to bring in the paperwork. Now, I will grant that you can infer from that that she probably never did. But it doesn't quite support the statements you've been giving me that doctors won't fill them out. Well, they never did. They've made a judgment she's not disabled. She continued to treat with these sources and they never followed up and said, okay, now I've examined you many times and I will fill out that paperwork. I think that's a valid inference from what I've been saying about those doctors' activities and actions in that case. So, Your Honor, I would like to the non-medical evidence. As Judge Bumatea's concurrence in Hudnall states, we believe that the revised regulations have abrogated that germane reason standard. It is under the revised regulations, as is very clear in the Federal Register, it's discretionary whether an ALJ wants to discuss non-medical evidence such as the claimant's family members here. This ALJ did, and he provided reasons for not finding it persuasive, which is what the comparison between 1520 and the medical opinions and 1527 under the old standard, the way it addresses non-medical evidence that previously an ALJ generally might have had to discuss it, but now they don't. They don't have any obligation. Is that still a live issue? No one has decided one way or the other? I just wanted to put that plug in there because your concurrence is fantastic. We would like that to become the law. But it was a concurrence, right? Yes, and it's not, it's unpublished. I understand. I understand. But the reasoning in it is valid in the comparison between 1520C, sub D, and 1527, sub F. So I am happy to answer any other questions. So I'm asked the same question I asked the opposing counsel. This case has been around for a long, long time. Not that long. Well, I think five years was the testimony. We have seen lots longer than that. That doesn't mean it's not a long time. The fact that there are some that are even longer than this one doesn't mean this one hasn't been around. Five years is longer than the Civil War. So in terms of potential mediation in this case, I want to hear what the government's position is. Well, Your Honor, mediation for us is we either defend an ALJ's decision because it's supported by substantial evidence or we don't. And there's no in between here. The first time we did find that the ALJ didn't adequately address fibromyalgia, this time around he did. So we are not open to any compromise here. We want the court to uphold the ALJ's decision. Thank you. Just a few points to make. There's a position that the appellee, the commissioners, and the ALJ simply do not understand fibromyalgia and they're ignoring the cases on point with regard to how that evidence of fibromyalgia and related symptoms are to be considered. I'll note that, as counsel pointed out, there was no muscle atrophy or muscle wasting. And that was one of the points highlighted by the ALJ as to why her disability was not supported. There's no requirement that, especially in the case of fibromyalgia, that a claimant suffer from muscle wasting. Muscle wasting is something that you see in conditions perhaps, well, not in fibromyalgia necessarily. The fact that he said that there would be a secondary effect, it's just in my opinion, in our opinion, a way to backdoor the objective evidence requirement. So just as articulated in our briefs, the ALJ simply did not understand fibromyalgia. His... Counsel, can I ask, your client did try to seek one of her doctors to support a disability finding under fibromyalgia, right? For her disability overall, it's not necessarily for fibromyalgia. Why do you think no doctor has had to agree to it? Well, that's not necessarily correct. I represented my client in her erythroclase as well, and she obtained forms supporting disability in that case. I don't know what happened with regard to why doctors... I mean... Is that in our record? Why is that not in our record? As far as the forms for... Yeah, the ERISA. They were not, I guess. They didn't make it in if they're not in there. But actually, there is evidence in there, and I think the ALJ just simply disregarded it as far as her being awarded ERISA benefits. But as far as the forms... Different standard, though, right? Different standard, right. And we're not saying that because she was awarded benefits in ERISA, that she's entitled to benefits here. What we're saying is that the ALJ simply did not consider the evidence in light of her fibromyalgia as the Ninth Circuit has articulated, and as the regulations require ALJs to consider. I think I ran out of time. Finish your point. Okay. Yeah, I have a couple points. With regard to testimony as having good or bad days, there is evidence in the record that she, in her testimony, that shows that she had waxing and waning symptoms. The fact that her first hearing versus her second hearing expressed that her symptoms had... Her first hearing, she said she had mostly bad days. In her second hearing, she said she had good and bad days. That's evidence of waxing and waning. Again, this is a FIBRO case. We did have points as to our articulation standards. Unless the court wants us to go into those issues, then... I think the evidence in the record is pretty clear that the ALJ simply cherry-picked the evidence, mischaracterized not only the evidence but the testimony, and did not support its decision with clear and convincing reasons or germane reasons for dismissing or rejecting third-party evidence. Thank you very much, counsel. Thanks to both of you for your briefing and argument in this case. This matter is submitted.
judges: CLIFTON, OWENS, BUMATAY